Mark D. HALL, Plaintiff,

v.

The UNIVERSITY OF MINNESOTA, a Minnesota Public Corporation, Charles H. Casey, individually and as Regent of the University of Minnesota, William B. Dosland, individually and as Regent of the University of Minnesota, Erwin L. Goldfine, individually and as Regent of the University of Minnesota, Lauris D. Krenik, individually and as Regent of the University of Minnesota, David M. Lebedoff, individually and as Regent of the University of Minnesota, Charles F. McGuiggan, individually and as Regent of the University of Minnesota, Wenda W. Moore, individually and as Regent of the University of Minnesota, Lloyd H. Peterson, individually and as Regent of the University of Minnesota, Mary T. Schertler, individually and as Regent of the University of Minnesota, Michael W. Unger, individually and as Regent of the University of Minnesota, David Roe, individually and as Regent of the University of Minnesota, Verne Long, individually and as Regent of the University of Minnesota, Willis Drake, individually and as Regent of the University of Minnesota, Jeanne T. Lupton, individually and as Dean of the General College of the University of Minnesota, Archibald Leyasmeyer, individually and as Faculty Director of the College Without Walls of the University of Minnesota, and Catherine Marieneau, individually and as Program Director of the College Without Walls of the University of Minnesota, Defendants.

Civ. No. 4–81–870.

United States District Court, D. Minnesota, Fourth Division.

Jan. 2, 1982.

Wurst, Carroll & Pearson by Albert Faulconer III, Minneapolis, Minn., for plaintiff.

Dorsey, Windhorst, Hannaford, Whitney & Halladay by Peter S. Hendrixson and J. Marquis Eastwood, Minneapolis, Minn., for defendants.

## FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER

### MILES W. LORD, Chief Judge.

This Court is presented with a serious and troubling question concerning the academic standing and athletic eligibility of a University of Minnesota varsity basketball player. The plaintiff in this action is a 21 year old black senior at the defendant University of Minnesota. He is also a formidable basketball player who, up to this season, played for the defendant University of Minnesota men's intercollegiate varsity basketball team. He is before the Court seeking an injunction ordering the University to admit him to a degree program, a prerequisite to the athletic eligibility he lost.

Because this Order must be issued prior to January 4, 1982, to be of benefit to the plaintiff, this Court does not have the luxury of setting forth an extensive discussion of the voluminous evidence that has been presented in support of and in opposition to this motion. The Court has reviewed all of the depositions and affidavits and has considered the arguments advanced by both parties during their oral presentation. This Order reflects the findings of fact and conclusions of law made by this Court.

The plaintiff was enrolled in a non-baccalaureate degree program at the defendant University's General College. His program terminated upon the accumulation of approximately 90 credits. Once his program terminated, the plaintiff attempted to enroll in a "degree program" at the University Without Walls (hereafter UWW), a college within the defendant University, and at the General College. The plaintiff was denied admission twice at UWW and once at the General College. By failing to enroll in a "degree program," the plaintiff lost his eligibility to play on the defendant University's basketball team according to Charles Liesenfelt, Director of Registration, Records & Scheduling. Liesenfelt contends that in order for the plaintiff to remain eligible to participate on the basketball team, he must be a "candidate for a degree" under Rule 1, § 1, A. Part Two, of the "Big Ten Handbook."

The plaintiff does meet the Big Ten eligibility standards with respect to grade point average and credit accumulation, but unless he is enrolled as a "candidate for a degree," he is ineligible to practice or play on the defendant University's basketball team. According to the coach of the University basketball team, the plaintiff is the only player he has known who has met the grade and credit criteria of the Big Ten but has been refused admission into a degree program.

The plaintiff filed this action on December 15, 1981, alleging that the defendants rejected his two applications to the UWW without affording him due process and in bad faith in an arbitrary and capricious manner. The plaintiff makes various other claims, but for the purpose of this motion, he relies primarily on the claim noted above. The plaintiff and the defendant agreed to expedite discovery and the plaintiff deposed nine individuals associated with the defendant University and the defendants deposed the plaintiff. On December

29, 1981, the plaintiff moved this Court for a preliminary injunction compelling his admission to a degree program. Unless the plaintiff is declared eligible for intercollegiate basketball competition on January 4, 1982, he will be ineligible to participate on the basketball team for all of the winter quarter of 1982 which comprises all but two or three games of the remaining season.

According to the evidence, if the plaintiff is accorded the opportunity to represent the University of Minnesota in intercollegiate varsity basketball competition during winter quarter of 1982, his senior year, he will have a significant opportunity to be a second round choice in the National Basketball Association draft this year, thereby acquiring a probable guarantee of his first year's compensation as a player in the National Basketball Association. If the plaintiff is denied the opportunity to participate in intercollegiate basketball competition on behalf of the University of Minnesota during winter quarter 1982, his chances for a professional career in basketball will be impaired; and it will be extremely unlikely that his compensation as a first year player in the National Basketball Association will be guaranteed. The evidence indicates that without an opportunity to play during the winter quarter of 1982, the plaintiff would likely be a sixth round choice in the National Basketball Association draft.

This Court has no hesitation in stating that the underlying reason for the plaintiff's desire to be enrolled in a degree program at the defendant University is the enhancement of his chances of becoming a professional basketball player. The plaintiff will probably never attain a degree should he be admitted to a degree program since the National Basketball Association draft occurs in April of 1982, well before the plaintiff could accumulate sufficient credits for a degree. The plaintiff was a highly recruited basketball player out of high school who was recruited to come to the University of Minnesota to be a basketball player and not a scholar. His academic record reflects that he has lived up to those expectations, as do the academic records of many of the athletes presented to this Court.

The plaintiff applied for admission to the UWW twice, once in August of 1981 and once in October of 1981. In each case, the UWW admissions committee determined, based on the plaintiff's application, that he should be admitted to the UWW introductory program. In each case, the directors of the program (further up in the hierarchy of the UWW) intervened in the admissions process and effectively directed the admissions committee to reject plaintiff's application. This interference by the directors never occurred in any other case as to any other student.

Prior to the intervention of the directors, one of the UWW directors contacted Dean Lupton of the General College concerning the plaintiff. The director summarized the information conveyed by Dean Lupton in a confidential memorandum regarding the plaintiff. The memorandum noted that the following factors bore on the plaintiff's application:

1. The "political aspects" of admitting plaintiff;

2. Plaintiff's "substantial" travel record (one weekend trip to Chicago in fall quarter 1981);

3. The plaintiff had earned "A's" in courses he was not eligible to be in;

4. The General College had found it necessary to monitor plaintiff's work through a Professor Harris;

5. The plaintiff improperly turned in work on Regent's letterhead stationary;

6. The plaintiff turned in work done by others as his;

7. That every "W" (withdrawal) on plaintiff's transcript was originally an "N" (equivalent to an "F");

8. That within four weeks of the commencement of classes, plaintiff typically had earned a grade of "N"; and

9. That plaintiff had put through fake approval forms on more than one occasion.

Most of these allegations are attributed (in the memorandum) to Dean Lupton of

the General College. The memorandum further states that Dean Lupton indicated that the plaintiff would not be accepted into a degree program at the General College, even though the plaintiff had not even applied at the time.

After receiving the above information, the director contacted another director and they in turn conveyed this information to the admissions committee and effectively instructed the committee to reject the plaintiff's application. Until plaintiff's case arose, the UWW admissions committee decision to admit had been considered final.

This memorandum was passed on to a successor director who, after the plaintiff reapplied and was again accepted by the admissions committee, effectively vetoed the decision of the admissions committee.

Opposed to the procedures set forth above used in processing the plaintiff's two applications to the UWW, the UWW distributed a pamphlet explaining the policies and procedures of admission. This pamphlet notes the following:

1. *The information you present* in your application will determine whether you are admitted to UWW. (emphasis added)

2. *Admissions decisions are based on your responses to the application form* which appears at the back of this booklet. (emphasis added)

3. *Your application will be reviewed and acted upon by an admissions committee* made up of UWW advisors. You will be notified in writing of the committee's decision. If you are not accepted, *the reasons for the decision will be explained* .... (emphasis added)

4. *The admissions committee will determine which applicants will be admitted* for enrollment in the Introductory Period. (emphasis added)

With regard to items 1 and 2 above, the UWW's Faculty Director testified that these statements were the correct policy with respect to processing UWW admission applications. He further stated that applicants to the UWW are supposed to be judged *solely* on the basis of their application form.

It seems apparent that the plaintiff was not judged solely on the basis of his applications and the information therein. Each time the admissions committee reviewed the plaintiff's application, they recommended that he be admitted. After the intervention of the directors and the communication of the information outlined in the above-mentioned memorandum, the plaintiff was denied admission. However, in both of the rejection letters sent to the plaintiff, none of the allegations noted in the memorandum were listed as reasons for the plaintiff's failure to gain admission to the UWW.

■ The plaintiff asserts that he has been denied his right to due process of law arising under the Fourteenth Amendment. Due process protects life, liberty and property. Protected property interests are usually created and defined by sources such as state laws. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A student's interest in attending a university is a property right protected by due process. *Abbaraio v. Hamline University School of Law*, 258 N.W.2d 108, 112 (Minn.1977); citing *Dixon v. Alabama State Bd. of Education*, 294 F.2d 150 (5th Cir. 1961), *cert. denied* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); *Gaspar v. Bruton*, 513 F.2d 843, 850 (10th Cir. 1975). The defendant asserts that while in cases of expulsion, public education may be a property right, in cases of nonadmission, public education is but a mere privilege, citing *Davis v. Southeastern Community College*, 424 F.Supp. 1341 (E.D.N.C.1976), *aff'd in part, vacated in part and remanded*, 574 F.2d 1158, *reversed on other grounds*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). However, the right versus privilege distinction has long been abandoned in the area of due process. *See Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970). And in any event, even though the plaintiff was denied admission, the circumstances of this case make it more like an expulsion case than a non-admission case. The plaintiff lost existing scholarship

rights; he cannot enroll in another college without sitting out one year of competition under athletic rules; and although he has attended the defendant University for several years, he may no longer register for day classes at the defendant University.

■ But to say that due process applies in the area of a student's interest in attending a university does not finish the analysis. One must answer the question of what process is due. "Due process is flexible and calls for such procedural protection as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Factors balanced to determine what process is due are: 1) the private interest affected by the action; 2) the risk of an erroneous deprivation of such interest through the procedures used and the value of additional procedural safeguards; and (3) the government's interest involved, including fiscal and administrative burdens. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The private interest at stake here, although ostensibly academic, is the plaintiff's ability to obtain a "no cut" contract with the National Basketball Association. The bachelor of arts, while a mark of achievement and distinction, does not in and of itself assure the applicant a means of earning a living. This applicant seems to recognize this and has opted to use his college career as a means of entry into professional sports as do many college athletes. His basketball career will be little affected by the absence or presence of a bachelor of arts degree. This plaintiff has put all of his "eggs" into the "basket" of professional basketball. The plaintiff would suffer a substantial loss if his career objectives were impaired.

The government's interest, i.e., the defendant University's interest, is the administrative burden of requiring a hearing or other due process safeguards for every rejection of every student who applies to the University. This burden would be tremendous and this Court would not require the defendant University to shoulder it.

The key factor in this case which weighs heavily in the plaintiff's favor is the risk of an erroneous deprivation given the nature of the proceedings used in processing the plaintiff's application. This Court is aware that in the area of academic decisions, judicial interference must be minimal. *See Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). However, an academic decision is based upon established academic criteria. *See Horowitz, supra* at 89–90, 98 S.Ct. at 954–55. In this case, the plaintiff's applications to the UWW were treated very differently than all other applications. The directors intervened in the process and provided the admissions committee with allegations concerning the plaintiff's conduct, a facet of the proceedings that taints this "academic" process and turns it into something much like a disciplinary proceeding. Given this aspect of the proceedings, it would appear that the plaintiff should have at least been notified that allegations had been made regarding his conduct so that he could have presented evidence in his own behalf. Without this safeguard, there exists a chance that the plaintiff may have been wrongfully accused of actions which then form the basis for his rejection.

■ This is not to say that all applicants who are rejected by the defendant University must be given an opportunity to rebut evidence used in evaluating a college application; however, if the defendant University intends to interject evidence concerning allegations of improper conduct of the applicant into the admissions process, it must provide the applicant an opportunity to give his or her side of the story.

Finally, one must consider all that has occurred in light of the standards utilized by the Courts in this Circuit in evaluating the propriety of issuing a preliminary injunction. Four factors determine whether a preliminary injunction should issue. They are: (1) the threat of irreparable harm to the moving party, (2) the state of balance between that harm and the injury that granting the injunction will inflict on other

parties, (3) the public interest, and (4) the probability that the movant will succeed on the merits of the claim. *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir. 1981); *Medtronic Inc. v. Catalyst Research Corp.,* 518 F.Supp. 946, 950 (D.Minn.1981); *Brotherhood, etc. v. Burlington Northern, Inc.,* 513 F.Supp. 1023, 1027 (D.Minn.1981).

With respect to the first factor, if the plaintiff is not eligible to play basketball by January 4, 1982, he will not play his senior year. This poses a substantial threat to his chances for a "no cut" contract in the National Basketball Association, according to his coach, and his overall aspirations regarding a career as a professional basketball player. It would be difficult indeed to measure the loss to the plaintiff in terms of dollars and cents. The injury is substantial and not really capable of an accurate monetary prediction. Thus, it would be irreparable. *See Danielson v. Local 275, Laborers Intern. Union of North America, AFL–CIO,* 479 F.2d 1033 (2d Cir. 1973); *see also, Phillips v. Crown Central Petroleum Corp.,* 602 F.2d 616 (4th Cir. 1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756.

The harm to the other parties, i.e., the defendant University, is difficult to assess. On the one hand, this Court doubts that the University men's intercollegiate varsity basketball team and coaching staff would characterize the reinstatement of the plaintiff to the team in terms of "harm." But the defendant University academic wing argues that if this Court orders the plaintiff into a degree program, its academic standards and integrity would be undermined. The plaintiff and his fellow athletes were never recruited on the basis of scholarship and it was never envisioned they would be on the Dean's List. Consequently we must view with some skepticism the defendant University's claim, regarding academic integrity. This Court is not saying that athletes are incapable of scholarship; however they are given little incentive to be scholars and few persons care how the student athlete performs academically, including many of the athletes themselves. The exceptionally tal-ented student athlete is led to perceive the basketball, football, and other athletic programs as farm teams and proving grounds for professional sports leagues. It well may be true that a good academic program for the athlete is made virtually impossible by the demands of their sport at the college level. If this situation causes harm to the University, it is because they have fostered it and the institution rather than the individual should suffer the consequence.

It appears from the record that there is a "tug of war" going on over this plaintiff. The academicians are pulling toward higher standards of achievement for all students while the athletic department must tug in the direction of fielding teams who contribute to paying a substantial share of the university's budget. In this tug of war the academic department will suffer substantially no ill effects if it loses. On the other hand, the athletic department, directors, coaches and personnel under this system are charged with the responsibility of at least maintaining and fielding teams which are capable of competing with the best in their conference or in the nation. This Court is not called upon to determine any long term solution to the dilemma posed. It is called upon to determine if the rights of an individual caught up in the struggle have been violated.

The only perceivable harm to the defendant University would result from the fact that the National Collegiate Athletic Association (NCAA), of which the defendant University is a member, has rules which permit certain sanctions to be leveled upon the defendant University should a player be declared eligible under a court order which is later vacated, stayed, reversed, etc. This rule defines sanctions including the vacation of the athlete's records for the period for which the athlete played, the forfeiture of games by the team, the declaration of ineligibility of the team for post-season tournaments, to the return of television receipts for games that the athlete played in. However, in this regard, the defendant University's destiny is in its own hands. The University does not have to appeal this

Order if it is fearful of the sanctions which might be imposed by the NCAA. And the defendant University's lawyer is of the opinion that the NCAA could not force an appeal. Therefore, an appeal with all of the usual uncertainties accompanying it is not mandated. It would be the defendant University's choice whether it wants to risk these sanctions at this time. Presumably some impartial arbitrator at the defendant University will make the decision of whether the defendant University will risk these potential sanctions.

The public interest is difficult to assess. It depends on whether the public prefers highly-tuned athletes who devote most of their waking hours to honing their athletic skills or whether it wants an individual with the plaintiff's athletic abilities to be required to make substantial scholastic achievement. There is no doubt that the public does have an interest but until the universities themselves clarify their position on the matter, the Court must assume that the public interest is equally ambivalent.

The fourth factor concerns the probability that the plaintiff will succeed ultimately on his suit. During the two weeks since this suit was filed, the plaintiff has revealed some disturbing facts regarding the defendant University's handling of the plaintiff's applications to the UWW and the General College. Besides the unusual procedures at the UWW, which forms the basis of this injunction and which has already been discussed, this Court has considered the Dean of the General College's testimony regarding the plaintiff's application to the General College. Dean Lupton testified that the plaintiff's summer school credits were not good evidence in determining whether the plaintiff has "shown progress" in his academic career because these courses were not General College courses. During the summer of 1981, the plaintiff enrolled in 30 credits of classes at the defendant University and successfully completed 26. The plaintiff received three "A's," four "B's" and one "C," and one "satisfactory." Dean Lupton and the defendants' other witnesses were unable to satisfactorily explain to this Court why the plaintiff's most recent academic endeavor would not be good evidence in assessing his capabilities and present attitudes or why they did not evidence "progress in his academic career." Although these courses were not the most esoteric in their nature, they were offered for credit by the defendant University.

The defendant University academic wing argues that, during the two quarters prior to applying to the General College, the plaintiff only completed 48% of the credits he attempted. If the General College would have considered the plaintiff's summer scholastic activity, his completion rate for the two quarters prior to his application would have been 72%.

This Court is of the opinion that the plaintiff has shown a substantial probability of success on at least his claim regarding the UWW. It is conceivable that the UWW may have had reason to deny the plaintiff admission to its degree program. However, the manner in which the UWW processed the plaintiff's application strongly suggests that he has been treated disparately and in a manner violative of due process. The plaintiff was given no notice nor any opportunity to answer the allegations leveled against him by the Dean of the General College. It is equally conceivable that the plaintiff would have had a "good answer" to these charges had he been given an opportunity to respond.

Balancing all of the above factors, this Court concludes that an injunction should issue requiring the defendant University to admit the plaintiff into a degree program on January 4, 1982 and to declare him eligible to compete in intercollegiate varsity basketball competition.

NOW, THEREFORE, IT IS ORDERED That during the pendency of this action, or until the final determination thereof, or until the Court shall otherwise Order, the defendant Regents, defendant Marieneau, defendant Lupton and defendant Leyasmeyer, and said defendants' agents, servants and employees, are enjoined and restrained from:

1. Preventing plaintiff's registration as a bona fide matriculated, registered and regularly enrolled resident candidate for a degree in the General College or the University Without Walls of the defendant University at the option of the defendant University.

2. Preventing plaintiff from enrolling for a full work load as defined by the regulations of the defendant University and certified by the University to the Big Ten Conference pursuant to eligibility Rule 4, Section 1, B of the July 1, 1981 Handbook of the Intercollegiate (Big Ten) Conference ("The Big Ten Handbook");

3. Failing to certify to the Big Ten Conference that plaintiff is eligible to compete in intercollegiate varsity basketball competition as a representative of the University, unless:

   a. Plaintiff fails to satisfy the applicable cumulative grade average requirement set forth in Eligibility Rule 3, Section 3, B of the Big Ten Handbook, or

   b. Plaintiff, after having been given a reasonable opportunity to do so, fails to register for a full work load as a student of the defendant University at or before the commencement of each University term during the pendency of this injunction.

4. Withholding distribution of scholarship proceeds due and payable to plaintiff for winter and spring quarters of 1982 under the grant-in-aid tendered plaintiff by the defendant University in the summer of 1981.