**James M. PICOZZI, Plaintiff,**

v.

**Terrance SANDALOW, Individually and in his Official Capacity as Dean of the University of Michigan Law School; et al., Defendants.**

**Civ. A. No. 84–CV–7406–AA.**

United States District Court,
E.D. Michigan, S.D.

Jan. 2, 1986.

---

William M. Kunstler, Ronald L. Kuby, Kunstler & Mason, and Mark B. Gombiner,

Gombiner & Avenia, New York City, for plaintiff.

Theodore Sachs, Sachs, Nunn, Kates, Kadushin & O'Hare, Detroit, Mich., and Peter A. Davis, Davis & Fajen, Ann Arbor, Mich. (Roderick D. Daane, Gen. Counsel, University of Michigan, Ann Arbor, Mich.), for defendants.

## OPINION

FEIKENS, Chief Judge.

Plaintiff James M. Picozzi ("Picozzi") brings this action against defendant Dean Terrance Sandalow [1] ("Sandalow") citing the Constitution of the United States and 42 U.S.C. § 1983, seeking both injunctive and monetary relief. Since an administrative hearing held pursuant to the parties' agreement resolved Picozzi's claim for injunctive relief,[2] only his damage claim remains before me. Both Picozzi and Sandalow move for Summary Judgment. I have jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

## I. FACTS

During his second year at the University of Michigan Law School, Picozzi leased room K–33 in the Lawyers Club, the law

---

1. President Harold Shapiro and the University of Michigan Board of Regents are also defendants. Picozzi's counsel agreed on the record before me to dismiss the Board of Regents based on their Eleventh Amendment immunity. No stipulation and order of dismissal has yet been filed with the Court. I therefore order the dismissal with prejudice of the Board of Regents, thus conforming the record to counsel's agreement with me.

The Eleventh Amendment also provides immunity to Sandalow and Shapiro in their official capacities. Accordingly, I order that these defendants, in their official capacities, be dismissed with prejudice.

This leaves Shapiro and Sandalow as defendants in their individual capacities. This opinion deals primarily with defendant Sandalow's liability. Accordingly, unless otherwise indicated, a reference to "defendant" means "defendant Sandalow." I dismiss with prejudice defendant Shapiro for the reasons given *infra*, pp. 1582–1583.

2. On August 24, 1984, Picozzi filed a verified complaint seeking a preliminary injunction ordering Sandalow to issue a letter of unqualified good standing on behalf of Picozzi. During a hearing on Picozzi's Motion for Preliminary Injunction, the parties agreed to resolve through an administrative hearing the questions of Picozzi's responsibility for the March 8, 1983, fire, and of his standing at the Law School. The Hearing Officer issued his decision "that the University of Michigan has not, by clear and convincing evidence, established that James M. Picozzi started the fire in Room K–33 at the University of Michigan Law School on March 8, 1983" on August 22, 1985. Hearing Officer's Decision at 42. Pursuant to this decision, Sandalow issued a letter of good standing on August 23, 1985. After presenting this letter, Picozzi was accepted by Yale Law School, where he is currently enrolled. Picozzi Supplemental Affidavit ¶¶ 7, 8.

school student residence. At about 4:00 a.m. on March 8, 1983, fire broke out in his room. Picozzi alleges that he awoke and attempted to leave the room and that because flames blocked the doorway to the hall, he used the third floor window to exit the room. He says he attempted initially to stay on the windowsill, but eventually either jumped or fell to the ground. As a result, he sustained burns and a fractured vertebra. He was treated at the University of Michigan Hospital from March 8 to April 2, 1983; he then transferred to the University of Pittsburgh Hospital in order to be closer to his family. He remained hospitalized until sometime in May, 1983, and in a body cast until October, 1983.

By April, 1983, it appeared that Picozzi would be physically unable to return to school during the 1983 Winter Term. On April 1, 1983, Associate Dean Eklund informed Picozzi's father that Picozzi had been disenrolled for the remainder of the 1983 Winter Term. See Complaint, Ex. J. Sandalow maintains, as recited in Dean Eklund's letter, that Picozzi was disenrolled at the request of Picozzi's father, in order to facilitate tuition and lease rebates. Although Picozzi denies that either he or his father ever requested disenrollment, it is clear that his father at least sought information regarding tuition adjustments for students absent from school for an extended period for medical reasons. See Complaint, Ex. K. I note that this factual dispute is not material to resolution of the case.

The fire aroused concern within the Law School community. In its March 16, 1983, edition, the Law School newspaper, *Res Gestae*, carried a front page story on the fire and its aftermath. The story included Sandalow's statement expressing distress over the incident and urging that rumors be quelled. See Complaint, Ex. G. On April 4, 1983, Sandalow again addressed the Law School community in an effort to calm the understandable anxiety created by acts of violence, including the fire within the dormitory. See Complaint, Ex. I.

Both public statements alluded to an ongoing police investigation of the fire. That investigation led the Ann Arbor Police Department to conclude almost immediately that the fire had been deliberately set. See Complaint, Ex. A at 15, 17. The investigators also concluded that Picozzi himself had likely set the fire. See Complaint, Ex. A at 115–16. Nonetheless, the Washtenaw County Prosecutor's Office declined to prosecute the case. See Complaint, Ex. A at 116, 118.

On May 13, 1983, Sandalow wrote Picozzi informing him that he would not be allowed to re-enroll at the Law School unless he either took and passed a polygraph test conducted by the police department or prevailed at an administrative hearing. Sandalow noted that "the Law School and the University have an independent interest in determining the identity of the person responsible, especially because the continuing presence of that individual within the community would create a serious risk to its members." Complaint, Ex. N. On June 29, 1983, Sandalow again wrote to Picozzi asking for a prompt reply in the interest of resolving the matter prior to the beginning of the 1983 Fall Term. See Complaint, Ex. O.

Picozzi responded to Sandalow's letters on July 18, 1983, stating that he was "not yet prepared to give a full response to [defendant's] ultimatum." Sandalow Affidavit, First Attachment. Although Sandalow replied on July 29, 1983, his letter was returned unclaimed. Sandalow Affidavit ¶ 6 and Second Attachment. In any event, the matter was not resolved prior to the 1983 Fall Term.

On November 7, 1983, Picozzi requested a letter from Sandalow regarding his academic status at the Law School. See Complaint, Ex. P. On November 16, 1983, Sandalow responded:

I am writing in response to your letter of November 7, 1983 requesting a statement regarding your academic standing and a copy of your transcript. A copy of your transcript is enclosed.

My understanding is that you are currently on a leave of absence from the Law School, having withdrawn while in good academic standing. A question remains regarding your eligibility to re-enroll. As I wrote on May 13, 1983 and again on June 29, 1983, information that we have received from the police has raised a question regarding your responsibility for the fire in your room on March 8. My hope, as I have previously written, is that the question of your responsibility might be resolved by your taking a polygraph examination as requested by the Ann Arbor Police. Were you to take and pass such an examination, under the circumstances stated in my earlier letters, you would of course be eligible to re-enroll at the Law School. If, however, you decide against taking the examination or if you fail to pass it, a hearing would be necessary to determine your eligibility to re-enroll.

Complaint, Ex. Q.

On November 23, 1983, Picozzi asked Sandalow to write to James Thomas, Dean of Yale Law School, informing him that Picozzi is "currently on leave of absence from the University of Michigan Law School, having withdrawn while in good academic standing." Complaint, Ex. R. On November 29, 1983, Sandalow replied that "it would be misleading for me to [write the requested letter] without a further statement indicating that there is a question regarding your eligibility to re-enroll at the Law School." Complaint, Ex. S. On December 5, 1983, Picozzi repeated his request for an unqualified letter. See Sandalow Affidavit, Third Attachment. Sandalow replied on December 13, 1983, with a proposed letter to Dean Thomas including an explanation regarding Picozzi's condi-

tional eligibility to re-enroll. *See* Complaint, Ex. T. Picozzi rejected the proposed letter. *See* Complaint, Ex. U. This ended the parties' communications with each other.

On July 30, 1984, Picozzi's counsel demanded that Sandalow write an unqualified letter of good standing. *See* Complaint, Ex. V. Sandalow refused. *See* Complaint, Ex. W. On August 24, 1984, Picozzi filed this lawsuit against the Regents of the University of Michigan, President Shapiro, and Dean Sandalow.

His complaint contains five counts. Count I alleges that defendant deprived plaintiff of liberty and property without due process of law. Count II alleges that defendant violated plaintiff's right to equal protection of the laws by conditioning his re-enrollment on successful completion of a polygraph exam or an administrative hearing. Count III alleges that defendant unconstitutionally conditioned the enjoyment of plaintiff's liberty and property upon plaintiff's waiver of his privilege against self-incrimination. Count IV summarily alleges that an *"ex parte* and *ultra vires* adjudicative mechanism" violated plaintiff's rights to equal protection of the law. Complaint ¶ 122. Count V alleges that defendant breached a contract with plaintiff.[3]

## II. PROCEDURAL DUE PROCESS

Picozzi's core claim is that Sandalow denied him procedural due process by detrimentally altering his status at the University without first affording him a hearing. Procedural due process claims require a two-step analysis. First, I must determine whether Sandalow deprived Picozzi of any liberty or property interest. Second, assuming I so find, I must determine whether

---

**3.** Although Picozzi charges Sandalow in the complaint's first paragraph with intentional infliction of emotional distress, he does not state this theory in a separate count or cause of action. I must conclude that he does not assert the theory against Sandalow. Even if Picozzi had raised the theory, I would find that the allegations of the complaint fail to support such

a cause of action under Michigan law. *See Roberts v. Auto-Owners Insurance Company,* 422 Mich. 594, 374 N.W.2d 905 (1985). Furthermore, *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), forbids my exercise of pendent jurisdiction to award damages against state officials for violation of state law.

the deprivation occurred without due process. *See Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) ("once it is determined that due process applies, the question remains what process is due."); *Benson v. Scott,* 734 F.2d 1181, 1184 (7th Cir.1984), *cert. denied,* ── U.S. ──, 105 S.Ct. 435, 83 L.Ed.2d 361 (1984) ("The usual analysis of a due process claim proceeds sequentially. First, one determines ... whether a protected property interest exists at all. If such an interest is found, one determines what procedures must be followed...."). In resolving these issues I note that both parties seek Summary Judgment, and that there are no material facts that are controverted.

### A. *Deprivation of Protected Interest*

The first question I must decide is whether Sandalow deprived Picozzi of a protected interest. I hold that he did. The gravamen of Picozzi's claim is that Sandalow altered his good standing at the Law School, making it impossible for him freely to pursue his studies there or at any other accredited law school. Picozzi could not return to his studies at the University of Michigan because of conditions imposed upon his re-enrollment. He could not complete his studies at any other accredited law school because no such law school would accept him as long as his status at the University of Michigan was less than unqualifiedly good.

■ A public university student has a protected interest in continuing his studies.[4] *See Ewing v. Board of Regents of the University of Michigan,* 742 F.2d 913, 915 (6th Cir.1984), *rev'd* (other grounds), ── U.S. ──, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) ("[A]n implied understanding that a student shall not be arbitrarily dismissed from his university is a property interest...."); *Dixon v. Alabama State Board of Education,* 294 F.2d 150, 157 (5th

Cir.1961), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); *Stoller v. College of Medicine,* 562 F.Supp. 403, 412 (M.D.Pa.1983), *aff'd* (without opinion), 727 F.2d 1101 (3d Cir.1984) ("[A] graduate student has a 'property' interest in continuing his studies."); *Hall v. University of Minnesota,* 530 F.Supp. 104, 107 (D.Minn.1982) ("A student's interest in attending a university is a property right protected by due process."). This is as it should be. Education is the key—or at least the prerequisite—to many successful careers, including a career in law. *See Dixon,* 294 F.2d 157. When the government provides professional graduate education, it should do so within the constraints of due process.

Sandalow does not directly contest this point, but he contends vigorously that Picozzi has no protected interest at stake in this case. He argues that Picozzi has pleaded a protected interest in only a letter of unqualified good standing and not in a general right to continue his studies. He asserts that Picozzi has no protected interest in such a letter. Of course, if Picozzi has not been deprived of a protected interest, no due process concerns arise.

■ Sandalow's argument construes the complaint too narrowly. Count I does allege a property deprivation in terms of a letter of good standing. Sandalow refused to issue such a letter because he had previously altered Picozzi's status at the Law School by conditioning his re-enrollment. In other words, the controversy over the letter reflected an underlying dispute over Sandalow's action temporarily and preliminarily restricting Picozzi's ability to continue his studies. Picozzi's allegation that Sandalow's actions "in denying plaintiff a letter of good standing ... deprived plaintiff of property without due process of law," Complaint ¶ 114, broadly construed, includes not only the controversy over the letter itself, but also the underlying dispute over Picozzi's status at the University.

---

**4.** Whether the interest is best termed "property" or "liberty" is not material. What is important is that Picozzi has an interest triggering due process.

The cases Sandalow cites to support his argument on this point involve interests dissimilar to the protected interest asserted by Picozzi. *Gearhart v. Thorne*, 768 F.2d 1072 (9th Cir.1985), *Lawrence v. Acree*, 665 F.2d 1319 (D.C.Cir.1981), and *Lodico v. United States*, 571 F.Supp. 21 (E.D.Mich. 1982) all involve performance evaluations or letters of recommendation. Picozzi has not claimed a protected interest in a letter of recommendation. He asked only for a letter confirming his good standing at the Law School. Sandalow refused the letter because Picozzi's status was not unqualifiedly good. Sandalow's action in altering Picozzi's status from "good" to something less than that, thus temporarily interfering with his ability to pursue his studies, is ultimately what this lawsuit tests. Cases dealing with performance evaluations and letters of recommendation simply have no relevance.

Before evaluating the adequacy of process employed, I must find not only that Picozzi has a protected interest at stake, but also that Sandalow deprived him of the interest. Although I have already held that there was a deprivation, its precise nature requires some definition.

*Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), helps define the deprivation in this case. In *Mathews*, the Court tested Social Security procedures for terminating a person's disability payments. The procedures included an evidentiary hearing prior to final termination of benefits. But the procedures also included a preliminary step permitting termination of benefits without an evidentiary hearing. At the preliminary step, the Court defined a claimant's interest as "the uninterrupted receipt of [disability payments] pending final administrative decision on his claim." *Mathews*, 424 U.S. at 340, 96 S.Ct. at 905. The Court held that a claimant could properly be deprived of this limited interest without a prior evidentiary hearing.

In this case, the deprivation was similarly limited. Sandalow neither imposed nor sought formal disciplinary sanctions.[5] Neither did he permanently and finally bar plaintiff's access to legal education. He simply placed a temporary and preliminary hurdle in Picozzi's path, *pending the outcome of an administrative hearing*. He made it clear to Picozzi that the University was ready to move ahead with a hearing at his convenience. *See* Complaint, Ex. O. Picozzi resisted the hearing. Even as late as August 30 and 31, 1984, during a hearing on his Motion for Preliminary Injunction, Picozzi continued to oppose a hearing.[6]

Although limited, the deprivation in this case is enough to trigger due process protection. Application of due process does not depend upon the weight of the interest, but upon the nature of the interest. *See Goss v. Lopez*, 419 U.S. 565, 575–76, 95 S.Ct. 729, 736–37, 42 L.Ed.2d 725 (1975); *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). I have already held that Picozzi had a protected interest in continuing his studies at the University. By burdening this interest, Sandalow triggered due process protections for plaintiff.

### B. Adequacy of Process

■ Although the weight of the protected interest is not relevant in triggering application of due process, it is an impor-

---

**5.** Picozzi has variously characterized Sandalow's action as suspension, expulsion, and *de facto* expulsion. Although I am bound in considering Sandalow's Motion for Summary Judgment to accept Picozzi's factual allegations as true (at least where the allegations are not contradicted by unanswered affidavit), nothing requires me to accept Picozzi's characterization of the factual allegations. No factual allegations support Picozzi's characterization of Sandalow's action.

*Cf.* Prelim.Inj.Trans. at 37 ("[Defendants' counsel]: [W]e are not seeking to discipline Mr. Picozzi by these proceedings. We are seeking to determine whether or not he can be re-enrolled in good standing.").

**6.** *See* Preliminary Injunction Transcript at 14–18, 27–29.

tant factor in determining the precise procedure due in a particular case. To guide decision of what process is due in a particular case, the Court has articulated broad principles of due process. In general, the decision involves balancing government interests with private interests. *Mathews*, 424 U.S. at 334, 96 S.Ct. at 902. More specifically, the Court stated:

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334–35, 96 S.Ct. at 903. I now apply these principles to this case and hold that defendant fully complied with the requirements of due process.

### 1. *Pre-deprivation Hearing*

█ The first question I must decide is whether Picozzi was entitled to a hearing prior to Sandalow's action depriving him of his interest in continuing his education pending the outcome of a full administrative hearing. I hold that he was not entitled to a hearing prior to deprivation of this limited interest. In *Goss, supra,* the Court applied procedural due process principles to an analogous, although more severe, situation of formal school discipline. The Court held that high school students facing ten-day suspensions are ordinarily entitled to some kind of hearing prior to suspension. The Court noted that the hearing required

need not involve any more than an informal discussion between the student and the disciplinarian immediately following the incident leading to discipline. *Goss,* 419 U.S. at 582, 584, 95 S.Ct. at 740, 741. Based on this assumption of informality, the Court concluded "that as a general rule notice and hearing should precede removal of the student from school." *Goss,* 419 U.S. at 582, 95 S.Ct. at 740. However, the Court stopped short of rigidly requiring a pre-suspension hearing in all cases. The Court stated:

We agree with the District Court ... that there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable, as the District Court indicated.

*Goss,* 419 U.S. at 582–83, 95 S.Ct. at 740.

This case falls squarely within the *Goss* provision for situations not requiring a pre-suspension hearing.[7] Sandalow's first letter to Picozzi following the fire specifically grounded Sandalow's actions in concern for the safety of the law school community. *See* Complaint, Ex. N. In an earlier memorandum addressed to the law school community, Sandalow addressed a rising anxiety among the community's members over various incidents of violence, including the fire, within the community. *See* Complaint, Ex. I. Such anxiety disrupts academic calm. This is precisely the situation in which *Goss* permits suspension without a prior hearing. *Cf. Joseph v. St. Charles Parish School Board,* 736 F.2d 1036, 1038 n. 2 (5th Cir.1984) (Construing *Goss* to per-

---

7. Picozzi's counsel conceded this during oral argument on these motions. Counsel stated that under *Goss,* Sandalow could have legitimately suspended Picozzi without a hearing immediately after the fire. Counsel qualified his concession by arguing that *Goss* permits

suspension without a prior hearing only if a hearing takes place promptly after the suspension. In this case, counsel noted, the hearing took place nearly two years after the fire. I consider Picozzi's timing argument elsewhere in my opinion. *See infra* pp. 1580–81.

mit suspension of a tenured teacher without a pre-suspension hearing where "immediate disciplinary action is necessary to prevent further disruption of the educational process.").

Even if Sandalow had not complied with *Goss*, I would hold that under *Mathews* Picozzi received all the process to which he was entitled. This case does not involve formal suspension or any other school discipline. At stake in this case is a preliminary and temporary interference with Picozzi's interest in continuing his education *pending the outcome of an administrative hearing* to be held at plaintiff's convenience. *See supra* pp. 1577–78. Although even this limited deprivation might in some cases inevitably delay a student's progress, in this case Picozzi could have promptly accepted Sandalow's offer of a hearing and cleared up his status at the Law School prior to the first date on which he was physically able to return to class,[8] further diminishing the severity of the deprivation. Under *Mathews*, the weight of the private interest affected is the first factor I must consider in determining the procedural protection required by due process. Because Picozzi's interest in this case is less weighty than the interest at stake in *Goss*, less procedural protection is due him than was due the plaintiffs in *Goss*.

Moreover, strong public interests, a second factor in *Mathews'* balance, supported Sandalow's action. First, he had a duty to protect the security of the law school community. He discharged his duty by conditioning Picozzi's re-enrollment on his clearing up the suspicion that naturally surrounded him as the subject of an unexplained arson fire. Second, Sandalow had a duty not to mislead other schools into thinking Picozzi was in unqualified good

standing at the Law School. If Picozzi's theory of the case prevails, Sandalow could be compelled to certify a student's unqualified good standing, even though the student was subject to suspicion, simply because the school had not yet been able to conduct a formal hearing. Dean Sandalow, and others in his position, must have in such cases the authority to take prompt and reasonable preliminary action that preserves the school's interest without finally and permanently depriving a student of his interest in continuing his education. *Cf. Scheuer v. Rhodes*, 416 U.S. 232, 246, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974) ("[O]fficials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office."). This is precisely what his action accomplished in this case.

Neither the specific dictates of *Goss* nor the general principles of *Mathews* entitled Picozzi to a hearing prior to Sandalow's action conditioning Picozzi's re-enrollment on his successful completion of a polygraph test or an administrative hearing.

### 2. *Law School Handbook*

■ Picozzi also argues that Sandalow denied him due process by using procedures other than those outlined in the Law School Handbook for "investigating and reporting student conduct bearing upon character and fitness for the practice of law." Complaint, Exhibit H. Although I doubt whether Picozzi has sufficiently pleaded this claim as a due process deprivation (he has pleaded the matter as a contract claim), I will address it only to say that Picozzi's claim, assuming it is properly pleaded, is legally untenable. Due process is a matter of federal constitutional law; failure to comply with state procedures does not, by

---

**8.** Picozzi was hospitalized until May, 1983, and remained in a body cast until October, 1983.

*See* Prelim.Inj.Trans. at 23. Sandalow first of-

**1580**

itself, violate due process.[9] *Board of Curators v. Horowitz,* 435 U.S. 78, 92 n. 8, 98 S.Ct. 948, 956 n. 8, 55 L.Ed.2d 124; *Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299, 309 (6th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985); *Hill v. Trustees of Indiana University,* 537 F.2d 248, 252 (7th Cir.1976); *Bates v. Sponberg,* 547 F.2d 325 (6th Cir. 1976); *Jaksa v. Regents of the University of Michigan,* 597 F.Supp. 1245, 1251 (E.D. Mich.1984).

■ The only question for me is whether Picozzi received *constitutionally* adequate notice and hearing. I have already discussed and passed upon the constitutional adequacy of the hearing procedure. In addition, I hold that Picozzi received constitutionally adequate notice of the basis for defendant's action. "The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). Constitutionally adequate notice is that which provides a person with sufficient information to make the eventual hearing meaningful. *See Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Already in his first letter to Picozzi, Sandalow made it clear that the purpose of conditioning Picozzi's re-enrollment was to determine his responsibility for the fire. *See* Complaint, Ex. N ("The information available to us has led me to conclude that I would not be warranted in permitting you to re-enroll without a close examination of the question whether you are the person responsible for setting the March 8 fire."). This is precisely the question that the 1985 administrative hearing finally adjudicated. Picozzi had official notice of it during May, 1983. Even if Sandalow had not made this perfectly clear by letter, I cannot believe anyone in Picozzi's position could have been unaware of the basis for the Dean's action.

fered Picozzi a hearing by letter dated May 13, 1983. *See* Complaint, Ex. N.

**3. *Timing of the Administrative Hearing***

■ Finally, Picozzi argues that the administrative hearing ultimately held should have taken place sooner than it did, even if not prior to Sandalow's preliminary action. Picozzi relies upon *Goss,* which permits suspension in some cases without a pre-suspension hearing, but requires in those cases that a hearing follow suspension "as soon as practicable." *Goss,* 419 U.S. at 583, 95 S.Ct. at 740. Picozzi argues that Sandalow failed to satisfy this requirement. I reject this argument.

First, Sandalow had no duty in this case to satisfy the strictures of *Goss. See supra* pp. 1578–79. Second, Picozzi himself is responsible for the delay in the hearing's commencement. In both his first and second letters to Picozzi, Sandalow urged prompt reply. *See* Complaint, Exs. N, O. In his second letter, Sandalow expressed his hope that the entire matter could be resolved prior to the beginning of 1983 Fall Term. *See* Complaint, Ex. O. Unfortunately, Picozzi's medical condition prevented such an early disposition of the matter. But even after he recovered, Picozzi—not Sandalow—resisted holding a hearing. *See* Prelim.Inj.Trans. at 14–18, 27–29. Picozzi cannot now complain of the delay he occasioned.

**C. *Qualified Immunity***

■ Even if Sandalow did violate Picozzi's procedural due process rights, and I hold he did not, I also hold that Sandalow is entitled on the facts of this case to qualified immunity. Qualified immunity seeks to provide state and federal officials, acting reasonably, with the authority to make difficult decisions and to exercise discretion without fear of being held to answer in damages. *See Wood v. Strickland,* 420 U.S. 308, 319–20, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975). In the words of the Supreme Court:

9. I do not mean to imply a finding that Sandalow violated applicable state or Law School procedures.

Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard.

*Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984). It is now clear that qualified immunity shields officials from damage liability as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *See also, Davis,* 104 S.Ct. at 3018; *Windsor v. The Tennessean,* 719 F.2d 155, 165 (6th Cir.1983), *cert. denied,* — U.S. —, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984).

■ In this case, Sandalow's action was objectively reasonable because it did not violate a clearly established right of which a reasonable person would have known. Neither *Goss, Mathews,* nor any other federal law [10] clearly requires a hearing prior to the preliminary action Sandalow took in this case. He faced a situation calling for prompt action and requiring reliance on information supplied by other people, precisely the situation in which *Wood* calls for application of the qualified immunity doctrine. *Wood,* 420 U.S. at 319, 95 S.Ct. at 999, *quoting Scheuer,* 416 U.S. at 246, 94 S.Ct. at 1691 ("As with executive officers faced with instances of civil disobedience, school officials, confronted with student behavior causing or threatening disruption, also have an 'obvious need for prompt action, and decisions must be made in reliance on factual information supplied by others.' "). He responded by altering Picozzi's status pending the outcome of a polygraph test, or a full administrative hearing. Even if this action violated Picozzi's constitutional right, Sandalow cannot be held liable for damages because the

right violated was not clearly established at the time he took the action.

## III. OTHER MATTERS

### A. *Equal Protection*

■ Counts II and IV of the complaint allege that Sandalow denied Picozzi equal protection by treating him differently than other students at the University. It is true that Sandalow conditioned the re-enrollment rights of Picozzi only. But he rightfully treated Picozzi differently than other students because Picozzi was not similarly situated with any other student. The unexplained arson fire took place in Picozzi's room, and no one else's room. No other student was seen near Picozzi's room at the time of the fire. In fact, the Ann Arbor Police Department informed Sandalow that they considered Picozzi the primary, if not the only, suspect. *See* Sandalow Affidavit ¶ 4. These factors provided a rational basis for his action with respect to Picozzi. Since Picozzi is not alleging denial of a fundamental right or a classification based on suspect class lines, this is all equal protection requires. *See, e.g., Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 271–73, 99 S.Ct. 2282, 2291–93, 60 L.Ed.2d 870.

### B. *Self-Incrimination*

■ Picozzi alleges in Count III that Sandalow deprived him of his privilege against self-incrimination. Although the complaint does not articulate a theory for this cause of action, he argues in his brief that Sandalow deprived him of his privilege by asking him to submit to a polygraph test. In Picozzi's words:

This request imposed an unconstitutional choice upon Mr. Picozzi. He either had to waive his right to silence ... or he had to request an administrative hearing at which his failure to take the examination was to be considered substantive evidence of his guilt.

at 3019–21.

---

**10.** Only federal law is relevant to the application of qualified immunity. *See Davis,* 104 S.Ct.

Plaintiff's Brief at 20. I hold that Picozzi was not deprived of his privilege against self-incrimination by Sandalow's request that plaintiff take a polygraph test.

Sandalow never conditioned Picozzi's re-enrollment rights on a polygraph test. He presented the polygraph test to Picozzi as an option to accept or reject. In fact, if Picozzi submitted to a polygraph test and failed, Sandalow would still have permitted him to go through an administrative hearing. *See* Complaint, Ex. Q ("If, however, you decide against taking the examination or if you fail to pass it, a hearing would be necessary to determine your eligibility to re-enroll."). That Picozzi's refusal to take the test might be used at the administrative hearing as evidence that he set the fire does not threaten his privilege. In the first place, the refusal would have virtually no probative value because Sandalow gave him the option of a polygraph or a hearing. I do not think this point would escape the attention of a qualified hearing officer. Furthermore, even though a person may assert the privilege against self-incrimination during a civil proceeding, the privilege protects a person from only criminal exposure. *See, e.g., Kastigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). The administrative hearing was a civil proceeding.

### C. *Contract*

 Count V of Picozzi's complaint alleges that he entered into a contract with the University upon enrollment at the Law School, and that the terms of this contract were contained in the Law School Handbook. He alleges that Sandalow breached this contract by failing to use the disciplinary procedures contained in the handbook. I reject this claim because I hold as a matter of law that Picozzi never entered into a contract to be governed by the procedures contained in the Law School Handbook. Even if he did enter into such a contract, I hold that Sandalow did not breach it in the manner alleged because

Sandalow never sought to discipline Picozzi. Furthermore, *Pennhurst, supra,* forbids me from exercising pendent jurisdiction over a state law claim against state officials for the purpose of ordering state officials to comply with state law, or of assessing damages against state officials for violation of state law.[11]

### D. *Defendant Shapiro*

Plaintiff's counsel stated before me on the record that he was retaining defendant Shapiro solely to preserve a motion for § 1988 attorney fees arising out of the Preliminary Injunction hearing and the administrative hearing. Although Picozzi has not presented the Court with a formal motion for fees, I *sua sponte* consider the matter now.

Under 42 U.S.C. § 1988, attorney fees are available to civil rights claimants. But no such fees may be awarded unless I find the party seeking fees to be a prevailing party. I hold that Picozzi was not a prevailing party at the Preliminary Injunction hearing. He wanted me to order defendants to issue an unqualified letter of good standing on his behalf. I did not enter such an order. Instead, the parties agreed after two mornings of discussion to conduct an administrative hearing to determine Picozzi's responsibility for the fire. Although defendants pressed for the hearing, Picozzi initially resisted it. As is evident from the transcript of the hearing, Picozzi was not a prevailing party. Accordingly, he is not entitled to § 1988 fees for the Preliminary Injunction hearing.

Picozzi did prevail at the administrative hearing conducted pursuant to the parties' agreement. But that outcome, although important to him, does not make him the prevailing party on his underlying civil rights cause of action. On the contrary, I have just held that his civil rights were not violated. Accordingly, the administrative

---

11. *Pennhurst's* rationale does not forbid me from exercising pendent jurisdiction to rule that state officials complied with state law. Such a

ruling by a federal court is not an "intrusion on state sovereignty." *Pennhurst,* 465 U.S. at 106, 104 S.Ct. at 911.

hearing cannot support § 1988 fees.[12]

There being no reason for Shapiro to remain a defendant in this case, I order that he be dismissed with prejudice.

## IV. DISPOSITION

For the reasons given in this opinion, defendant Sandalow's Motion for Summary Judgment is GRANTED on all counts, and plaintiff Picozzi's Motion for Partial Summary Judgment is DENIED on all counts. In addition, defendants Shapiro and Board of Regents are DISMISSED with prejudice.

IT IS SO ORDERED.

12. Even if Picozzi were a prevailing party for purposes of § 1988, I would exercise my statutory discretion to deny an award of attorney fees in this case.